UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-20519-CR-LENARD/GOODMAN

UNITED STATES OF AMERICA

v.

JAMES SABATINO, et al.

      Defendants.

_____/

IN RE: CROWN PAWN LLC,

      Third-Party Petitioner.

_____/

**REPORT AND RECOMMENDATIONS CONCERNING**
**CROWN PAWN LLC'S PETITION TO SET ASIDE FORFEITURE**

## I.    Introduction

Following a criminal trial and the forfeiture of several hundred thousand dollars of fraudulently obtained assets (primarily jewelry, watches, and purses) that Crown Pawn LLC purchased from the criminal defendants, Crown filed a petition to determine its interest in the assets and requested an ancillary hearing. [ECF Nos. 133; 152]. United States District Judge Joan A. Lenard referred the petition to the Undersigned. [ECF No. 240]. The parties fully briefed the matter, and on January 16, 2018, I held an evidentiary hearing on Crown's petition. [ECF Nos. 152; 172; 325].

Crown raises two statutory theories to support its claim. First, Crown argues that

it was an innocent, *bona fide* purchaser for value of the items. It contends that it was the **victim** of a crime because the defendants' criminal scheme involved duping Crown into purchasing the expensive goods that the defendants had fraudulently obtained.

Second, Crown argues that it has a superior interest in the forfeited property. In support, Crown again characterizes itself as a victim of the defendants' crimes. Crown then argues that it already had a vested interest in the goods before a crime occurred because the crime of fraud was not consummated until Crown was itself duped into purchasing the stolen items.

Both theories generate one overarching issue: can a pawnshop that was not criminally charged portray itself as a **victim** of a criminal scheme to fraudulently obtain luxury items and thus prevent the United States from forfeiting its interest in those items? Under the specific circumstances of the relevant factual scenario developed in this case, the answer is "no."

At bottom, Crown has not met its burden of establishing either of the two theories upon which it relies. That is because if Crown's view of being a victim is correct, then its self-described status is based, at least in part, on its own conduct. To a significant degree, Crown is responsible for its own predicament because it did not conduct sufficient due diligence when confronted with myriad flags warning of suspicious and atypical activity underlying the defendants' offer to sell it the forfeited items.

Therefore, for the reasons outlined below, the Undersigned **respectfully recommends** that Judge Lenard **deny** Crown's petition.

## II.     Procedural and Factual Background

Posing as a recording-music company employee, Defendant James Sabatino conned designer clothing, handbag, and jewelry businesses into loaning him luxury goods, on the false premise that the items would be featured in music videos and photo shoots and then returned. But instead of returning the items, Sabatino conspired with others, including Defendants Denise Siksha Lewis and Valerie Kay Hunt, to steal the merchandise and then sell some of it to pawnshops in Fort Lauderdale and Deerfield Beach, Florida.

A federal grand jury indicted Sabatino, Hunt, and Lewis, among others, on various mail and wire fraud charges stemming from the scheme. [ECF No. 3]. The Indictment also included forfeiture allegations, which alleged that upon conviction of any of the charged violations, the defendants must each forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, under 18 U.S.C. § 981(a)(1)(C). [ECF No. 3, pp. 11–12].

The Indictment alleged that the property subject to forfeiture included, among other things, the following luxury goods:

  i.   Three (3) Judith Leiber Couture clutch bags, seized on or about August 12, 2015;

 ii.   Two (2) Audemars Piguet watches, seized on or about August 12, 2015;

iii.   Eleven (11) Tiffany & Co. bracelets and watches, seized on or about August 12, 2015;

iv.   Thirteen (13) Jimmy Choo handbags and shoes, seized on or about August 12, 2015;

v.   Three (3) Alexander Wang tote bags, seized on or about August 12, 2015;

vi.   One (1) Judith Leiber Couture clutch bag, seized on or about August 19, 2015; and

vii.   Ten (10) Jimmy Choo handbags and shoes, seized on or about August 19, 2015.

[ECF No. 3, p. 12].[1]

Lewis and Hunt entered into written plea agreements, and both pled guilty to Count 1 of the Indictment, which charged conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349. [ECF Nos. 98; 100; 162–63]. As a result, the Court entered preliminary orders of forfeiture against Lewis and Hunt, which forfeited, subject to third-party interests, their right, title, and interest in the goods listed above. [ECF

---

[1]   The record is unclear concerning whether the items Crown is litigating to receive include those listed in (vi) and (vii). Crown's petition lists all the items. [ECF No. 152]. The Government's response references an email from Crown's counsel that supposedly excludes the items listed in (vi) and (vii) [ECF No. 172, pp. 6–7], but the Undersigned was not provided with that email. The United States also filed a Notice of Final Forfeiture as to those items. [ECF No. 266]. But Crown's proposed Report and Recommendations makes no such limitation. [ECF No. 371].

The lack of clarity, however, is inconsequential here because the Undersigned ultimately recommends that the Court deny Crown's petition in its entirety. The Undersigned raises this discrepancy to simply clear the record.

Nos. 133; 186].

After receiving notice,[2] Crown filed its petition to set aside the forfeitures, claiming that it was a *bona fide* purchaser of the forfeited property. [ECF No. 152, p. 4]. Crown alleged that it "purchased [the forfeited items] from [Hunt and Lewis] as a *bona fide* purchaser for value without knowledge that said individuals were not owners rightfully in possession of the items of personal property or obtained [sic] by the same fraud." [ECF No. 152, p. 4]. Crown also alleged that it "had no reason to be concerned or suspicious that the items of personal property where obtained by the Defendants through fraud or collusion[.]" [ECF No. 152, p. 5]. Crown similarly alleged that it "had no reason to suspect that the transactions were anything but legitimate to exercise reasonable and due care to protect itself from fraud[.]" [ECF No. 152, p. 6]. Moreover, Crown described itself as "an innocent **victim** of a fraudulent scheme specifically targeted by the Defendants to be victimized[.]" [ECF No. 152, p. 5 (emphasis added)].

Later, in a bench memorandum, Crown also claimed that, apart from its *bona-fide*-purchaser status, it had a superior interest in the forfeited assets. [ECF No. 313, pp. 4–5]. Crown argued that the crime of fraud "could not have been consummated nor could have attached to the property . . . at any time frame until after [Crown] paid [the

---

[2]     In accordance with 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2(b)(6), the United States sent direct notice of the forfeiture of the items to Crown, among other potential claimants. The United States also published the notice on an official government website (www.forfeiture.gov) for at least 30 consecutive days, beginning on April 18, 2017, and ending on May 17, 2017. [ECF No. 147].

defendants] money or cash for the personal property sought to be forfeited[.]" [ECF No. 313, p. 4]. Crown claims that "[t]he criminal act of fraud did not occur nor was the crime completed or consummated until [Crown] came in possession of the luxury items and paid the Defendants for the goods." [ECF No. 313, pp. 4–5]. As a result, Crown concludes, its "interest in the luxury goods at the time of the commission of the acts which gave rise to the fraud were vested in [Crown] rather than after the commission of the crime," making it "clearly superior to any right that the Defendants had in the property under the law of the State of Florida." [ECF No. 313, p. 5].

The Undersigned held an evidentiary hearing on Crown's claims on January 16, 2018.[3] Aside from Crown, no other third-party claimants have filed a judicial claim to the forfeited items at issue, and the time for filing a claim has expired.[4]

## III.   Legal Standard

Twenty-one U.S.C. § 853(n)(6) sets forth the burden of proof and statutory grounds third-party petitioners must meet to claim forfeited property:

If, after the hearing, the court determines that the petitioner has

---

[3]      The Undersigned originally scheduled the evidentiary hearing for November 20, 2017, but the United States asked that it be rescheduled because of logistical difficulties concerning a critical witness, Hunt, who was unexpectedly en route to her designated federal prison facility in West Virginia. [ECF No. 278]. The Undersigned moved the hearing to December 21, 2017, but the United States again moved for a continuance, also due to logistical difficulties concerning Hunt. [ECF Nos. 280; 300]. And so the evidentiary hearing was finally held on January 16, 2018. [ECF Nos. 302; 325].

[4]      In administrative forfeiture proceedings, however, Tiffany & Co., Audemars Piguet, and Judith Leiber have asserted victim claims to the forfeited assets.

established by a preponderance of the evidence that--

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

§ 853(n)(6).

In determining whether a petitioner has met its burden, the district court must consider relevant portions of the criminal record, including sentencing, and additional evidence presented at a hearing. § 853(n)(5); *United States v. Cohen*, 243 F. App'x 531, 533–34 (11th Cir. 2007) (upholding district court's reliance on facts established in criminal case when considering third-party claim to forfeited assets).

In general, ancillary proceedings are not a forum in which third parties can re-litigate issues that were already determined in the criminal case, such as that property was subject to forfeiture. *See United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012) (holding that third-party claimants "may not relitigate the merits of a forfeitability determination"); *see also United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014) ("like every circuit to have reached the issue, we hold that third parties lack statutory

7

standing to challenge a district court's determination . . . that certain property is subject to forfeiture.").

IV.   **Analysis**

A.   *Superior Interest Under § 853(n)(6)(A)*

Because it failed to assert its superior-interest claim in its petition, Crown arguably lacks statutory standing to advance that theory of claim. *See United States v. Soreide*, 461 F.3d 1351, 1355 (11th Cir. 2006) (holding that superior-interest claim not asserted in petitions was now "belated" and "not asserted as required by the statute"); *accord United States v. White*, 675 F.3d 1073, 1079 (8th Cir. 2012) ("Courts typically look askance at belated attempts to add new or additional grounds for relief to third-party petitions."). Nonetheless, even if the Court were to consider the merits of Crown's superior-interest claim, Crown would *still* not be entitled to recover the forfeited assets.

Under § 853(c), "[a]ll right, title, and interest in property [subject to forfeiture] vests in the United States upon the commission of the act giving rise to forfeiture under this section." § 853(c). Thus, "[a]ny such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States[.]" § 853(c). So to prevail under § 853(n)(6)(A), Crown had to demonstrate that it had a superior interest "at the time of the commission of the acts which gave rise to the forfeiture of the property." § 853(n)(6)(A).

In this manner, § 853 adopts a "relation-back rule" -- i.e., if "money or property is subsequently transferred to a person other than the defendant," then "that money or property vests in the United States upon the commission of the act giving rise to forfeiture unless the third party can demonstrate his right to the property in an § 853(n) hearing." *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1212 (11th Cir. 2013) (internal quotations omitted). Consequently, "[i]n order to have a superior interest, then, [Crown] must have had a legal right, title, or interest in the forfeitable properties that *preceded* the commission of the crime that gave rise to the forfeiture of that property." *See United States v. Eldick*, 223 F. App'x 837, 840 (11th Cir. 2007); *see also United States v. Kennedy*, 201 F.3d 1324, 1331 (11th Cir. 2000) (holding that petitioner could not prevail under § 853(n)(6)(A) because her interest had not "vested at the time of the act giving rise to the forfeiture.").

This "leads inevitably to the conclusion that § 853(n)(6)(A) is **likely** never to apply to proceeds of the crime." *Eldick*, 223 F. App'x at 840 (quoting *United States v. Hooper*, 229 F.3d 818, 821–22 (9th Cir. 2000)) (emphasis added); *see also United States v. Cooper*, 679 F. App'x 738, 743 (11th Cir. 2017) (citing *Hooper* for the proposition that "§ 853(n)(6)(A) is likely never to apply to proceeds of the crime"). That is because "[p]roceeds of crime . . . do not **precede** the crime." *Hooper*, 229 F.3d 818, 822 (emphasis added); *see also United States v. Warshak*, No. 09-3321, 2011 WL 2450991, at *2 (6th Cir. Mar. 30, 2011) (same).

Here, to bolster its belated superior-interest claim, Crown argues that the defendants' fraud "did not occur" until Crown purchased forfeited assets.[5] But Count 1 of the Indictment charged the defendants with a conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349. [ECF No. 3]. The elements of that offense do not require fraudulent property to be sold. *See* Pattern Crim. Jury Instr. 11th Cir. 54 (Conspiracy to Commit [Mail] Fraud).

But more significantly, under the relation-back doctrine, the United States' interest vests "upon the commission of the act giving rise to forfeiture." § 853(c). As a result, the United States' interest in the forfeited assets vested upon the criminal defendants' **receipt** of the items, as the criminal act that gave rise to forfeiture was their prior agreement to obtain the property by defrauding the designer companies. [ECF No. 133]. The Undersigned, therefore, rejects the argument that the criminal act did not occur until the pawnshops purchased the items from the defendants.[6]

---

[5]     In its proposed Report and Recommendations, for example, Crown argues:

All the Defendants named in the indictment schemed to commit fraud by actually selling the products while in the Defendants' possession to targeted pawn-brokers, including Crown Pawn, so that the Defendants could profit illegally by conveying the property by denying the original owners of the possession and ownership of the same, and by obtaining money or cash for items the Defendants did not own from the pawn shops.

 [ECF No. 371, p. 4].

[6]     Crown cites *United States v. Shefton*, 548 F.3d 1360 (11th Cir. 2008) to support its

Moreover, the Court has already determined that the forfeited assets constitute fraud proceeds that were obtained as a result of the fraud conspiracy charged in Count 1 of Indictment. [ECF Nos. 133; 186]. Indeed, Crown admittedly purchased the forfeited items from Hunt and Lewis [ECF No. 331-1], so its interest necessarily vested *after* the interest of the United States. Accordingly, Crown does not have (and cannot have) a superior interest in the forfeited assets under § 853(n)(6)(A). *See United States v. Davis*, No. 02-21023-CR, 2007 WL 1362614, at *6 (S.D. Fla. May 7, 2007) (finding petitioner could not recover under § 853(n)(6)(A) because it was undisputed that forfeited property -- a 34-foot Rinker Cabin Cruiser boat -- was obtained with criminal proceeds and that petitioner obtained his interest *after* fraud occurred).

### B.   *Bona Fide Purchaser Under § 853(n)(6)(B)*

In general, "[a] third party may establish his interest in forfeited property by showing that he is (i) a bona fide purchaser for value, (ii) who 'was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture

---

theory, but that case is distinguishable for several reasons. First, *Shefton* primarily involved the unique issue of whether a constructive trust could provide a superior legal interest under § 853(n)(6)(A). Second, the relation-back analysis in *Shefton* arose in a completely different scenario: a title insurance company was subrogated to the rights and claims of a defrauded mortgage company. Third, the United States acknowledged that the title insurance company was a victim of the fraud and never raised the relation-back rule as a ground to deny the petition. Instead, the United States argued (unsuccessfully) that the title company lacked standing to raise a claim because it was merely one of many victims and, as such, an unsecured creditor without a "legal interest" in the property.

under this section.'" *United States v. Suarez*, No. 17-10802, 2018 WL 1566524, at *1 (11th Cir. Mar. 30, 2018) (quoting § 853(n)(6)). "[S]tate law determines the nature of a claimant's interest in forfeited property." *Id.* And after the petitioner's interest is determined under state law, federal law controls whether that interest is superior to the defendant's interest at the time of the criminal acts giving rise to the forfeiture. *Kennedy*, 201 F.3d at 1334.

Crown's only remaining avenue for relief -- as a *bona fide* purchaser for value under § 853(n)(6)(B) -- is unavailing. For all practical purposes, Crown contends that it is "being unfairly treated as something less than [an] innocent victim by merely being a part of the pawnbroking industry in general." [ECF No. 371, p. 25]. But the Undersigned's recommendation is not based on a condemnation of the entire pawnbroking industry. Instead, it is premised on the conduct of one pawnbroker under a particular set of circumstances -- i.e., a scenario where it, for example, ignored myriad warnings and violated its compliance program.

   i.   **Legal Interest as *Bona Fide* Purchaser**

The United States first focuses on two watches that Crown purchased, arguing that Crown did not yet own the watches because the 30-day statutory holding period had not expired. Under the Florida Pawnbroking Act, Crown was required to secure and maintain the two Audemars Piguet watches for 30 calendar days. *See* Fla. Stat. § 539.001(9)(c) ("All goods delivered to a pawnbroker in a pawn or purchase transaction

must be securely stored and maintained in an unaltered condition within the jurisdiction of the appropriate law enforcement official for a period of 30 calendar days after the transaction."). The Florida Pawnbroking Act then explains that "[p]ledged goods not redeemed within the 30-day period following the maturity date of a pawn are automatically forfeited to the pawnbroker" and "absolute right, title, and interest in and to the goods shall vest in and shall be deemed conveyed to the pawnbroker by operation of law." § 539.001(10).

Here, Crown acquired from Hunt the two Audemars Piguet watches on July 15, 2015. [ECF No. 331, pp. 25–26]. Law enforcement agents seized the watches on August 12, 2015. [ECF Nos. 331-2; 357, pp. 37, 142, 232]. That was within 30 days of their sale to Crown. Indeed, Crown conceded in its bench memorandum that "[t]here is no dispute that because the 2 Audemars Piquet [watches] were seized prior to the expiration of the 30 day period, absolute right, title and interest in and to the goods did *not* vest automatically to the Petitioner/Pawnbroker." [ECF No. 313, p. 10].

Thus, it would seem that ownership of the watches had not been fully conveyed to Crown until after the expiration of the 30-day statutory holding period. *See Ross v. M/Y ANDREA ARAS*, No. 05-61238 CIV, 2007 WL 842675, at *1 (S.D. Fla. Mar. 16, 2007) (denying pawnbroker's bona fide purchaser claim to pawned item, explaining: "If title and ownership are conveyed to the pawnbroker upon expiration of this time period, by negative implication, one can conclude that they are not conveyed prior to that point").

As a result, the United States contends that Crown's interest in the two Audemars Piguet watches was "something less than full ownership," and it "was not a bona fide purchaser for value." *Id.*

To still obtain the two watches despite its less-than-complete ownership claim, Crown argued that it has a superior interest to them under section 15(b)(2) of the Pawnbroking Act. [ECF No. 313, pp. 10–11]. That section says that "[i]f the conveying customer is convicted of theft, a violation of this section, or dealing in stolen property, the court shall *order the conveying customer to repay the pawnbroker* the full amount the conveying customer received from the pawnbroker for the property, plus all applicable pawn service charges." § 539.001(15)(b)(2). But Crown's reliance on that section is misplaced.

Federal law, and not state law, "decides what interests are subject to forfeiture under section 853." *Kennedy*, 201 F.3d at 1334. In forfeiting the forfeited assets to the United States, the Court has *already determined* that the assets were misappropriated. [ECF No. 133]. Thus, under the Florida Pawnbroking Act, Crown is entitled to only **repayment from the defendants**, and not a return of the forfeited assets. § 539.001(15)(b)(2); [*see* ECF No. 285-3 (final judgment in replevin action filed in county court for Broward County, Florida, returning stolen watch acquired by Crown to lawful owner)]. Lacking a direct claim under Florida law to the forfeited assets, Crown cannot prevail under § 853(n)(6)(B). *Watkins*, 320 F.3d at 1283 (holding that secured or

14

unsecured creditors who "enjoy a legal interest in the entire estate of the debtor . . . [b]y this very definition . . . plainly fall outside the scope of § 853(n)(6)(B)").

To be sure, the United States' argument here rests on the implicit assumption that only petitioners with *total* ownership may seek relief as a bona fide purchaser for value, foreclosing petitioners with lesser interests from ever prevailing. The Undersigned finds that this unstated theory may sweep too broadly, as it suggests that a secured creditor (such as a bank holding a lienholder interest under a record mortgage) could not qualify as a *bona fide* purchaser for value under § 853(n)(6)(B). *Cf. Shefton*, 548 F.3d at 1365 (holding that constructive trust, even though it is only an equitable remedy, can create for the petitioner a "legal right, title or interest" in property sufficient to constitute a superior legal interest under subsection (n)(6)(A)); *see also Watkins*, 320 F.3d at 1283–84 (distinguishing secured creditors whose security interests attached to unsecured creditors, who the Court determined are not bona fide purchasers under Section 853(n)(6)(B).

On the other hand, in a recent, unpublished opinion, the Eleventh Circuit defined "bona fide purchaser" in a way that would undermine Crown's claim here. Specifically, in *Suarez*, the Eleventh Circuit explained:

> Under Florida law, to be a *bona fide* purchaser, the purchaser must have "(1) **acquired legal title** to the property in question, (2) paid value therefore, and (3) been innocent of knowledge of the equity against the property at the time when consideration was paid and title acquired." *DGG Dev. Corp. v. Estate of Capponi*, 983 So.2d 1232, 1234 (Fla. Dist. Ct. App. 2008).

*Suarez*, 2018 WL 1566524, at *1 (emphasis added).

But the Undersigned need not determine whether Crown's less-that-complete ownership of these two watches as a pawnbroker whose rights had not fully vested under the 30-day state statute automatically precludes it from being a *bona fide* purchaser. That is because Crown has not established the **other** statutory prerequisites -- i.e., being (at the time of the purchases) "reasonably without cause to believe that the property was subject to forfeiture." § 853(n)(6).

### ii.      Cause to Believe that Property was Subject to Forfeiture

Crown has failed to prove that it reasonably believed that the defendants had not misappropriated the forfeited assets. This issue relates to Crown's contention that it is a victim, tricked into believing that it was buying legitimately acquired merchandise. It is also the issue where the United States contends that Crown did not act reasonably.

The test is an objective one, and it focuses on "whether the petitioner *reasonably* held the belief that the property was not subject to forfeiture." *United States v. Medina Cuartes*, 155 F. Supp. 2d 1338, 1343 (S.D. Fla. 2001) (emphasis added and internal quotation omitted). "In other words, a genuinely held belief that property is not subject to forfeiture is unavailing unless the belief was objectively reasonable in the circumstances." *Id.* (internal quotation omitted). "This standard precludes [willful] blindness on the part of a petitioner and imposes a duty of reasonable inquiry, where warranted, before objective reasonableness can be established." *Id.* (internal quotation

omitted). "Petitioner carries the burden of proof and must establish his position by a preponderance of the evidence." *Id.*

In this case, Crown fails the objective-belief test for three reasons. First, it failed to prove that it paid fair market value for the forfeited items. Second, Crown employees ignored common sense signs showing that the defendants had illicitly obtained the forfeited assets. Third, Crown violated the Florida Pawnbroking Act, federal reporting requirements, and its own anti-money laundering ("AML") compliance program in acquiring the forfeited assets. Each reason is addressed in turn.

### 1.    *Value of the Subject Forfeited Assets*

Although Crown's representatives testified that Crown, through its employees, generally researched prices online, with one employee recalling looking into Jimmy Choo, Judith Leiber, and Tiffany items sold by the defendants, Crown provided no documentary evidence to support any specific value it paid for the forfeited assets. [ECF Nos. 331-1, p. 2; 357, pp. 32, 77–78, 124–28, 139]. At best, Crown tried to establish that it *generally* pays 45 to 60 percent of an item's resale value, or "eBay asking price," and sometimes more for watches. [ECF No. 357, p. 78]. But the only documentary evidence to verify these representations demonstrates that Crown paid Hunt and Lewis significantly less than the "45-to-60-percent-of-eBay-value" formula it says it used.

For example, of the items the defendants sold to the pawnshop, Crown sold three

pairs of Jimmy Choo shoes on eBay for about $400.[7] [ECF Nos. 331-1, p. 14; 331-6; 357, p. 52]. Crown purchased these pairs of Jimmy Choo shoes for $20 each, for a total of $60. [ECF Nos. 331-1, p. 19; 357, p. 53]. So Crown Pawn paid approximately **15** percent, not 45 to 60 percent, of the "eBay value" for these shoes.

Furthermore, when they were delivered to Crown, the forfeited assets were brand new or nearly brand new, as the defendants had recently obtained the items directly from the designer goods companies. [ECF Nos. 100, pp. 7–8; 331-9]. These companies had every incentive to provide new merchandise because they believed their goods would be featured in celebrity photo and video shoots. [*See* ECF No. 113, p. 6]. While Crown employees testified that at least some of the forfeited assets appeared used, the criminal case record shows that, upon receipt, the defendants almost immediately sold the fraudulently obtained merchandise to Crown. [*Compare* ECF No. 357, pp. 52, 54, 117 *with* ECF No. 113, pp. 8–11].

For instance, Jimmy Choo sent merchandise to Lewis on June 22 and June 24, 2015. [ECF No. 113, p. 8]. Within a few days, on June 26 and June 28, 2014, Lewis sold Jimmy Choo handbags and shoes to Crown. [ECF No. 331-1, pp. 18–19]. Crown's owner inspected at least one of the boxes that Jimmy Choo sent to Lewis, confirming that the company had directly shipped the goods to her. [ECF No. 357, pp. 154–155].

Judith Leiber sent items to Lewis on June 29, 2015, after receiving a request (to

---

[7]    Because they were sold, the shoes were not seized by law enforcement agents and are not part of the forfeited assets.

temporarily use the merchandise) from Sabatino. [ECF No. 113, p. 10]. Shortly after, on July 6, 2015, Lewis sold three Judith Leiber clutches to Crown. [ECF No. 331-1, p. 21].

Hunt received merchandise from Tiffany & Co. on July 10 and 12, 2015. [ECF No. 113, p. 9]. On the same dates, she sold Tiffany watches and bracelets to Crown. [ECF No. 331-1, pp. 22–24, 27–29].

Audemars Piguet delivered watches to Hunt on July 15, 2015. [ECF No. 113, pp. 10–11]. On the same day or the next day, she sold two Audemars Piguet watches to Crown Pawn. [ECF Nos. 331-1, pp. 25–26; 357, pp. 197–200; 211].

Given these facts, the retail prices for the forfeited assets are a reasonable approximation of the values for the items. But even if the Court were to give Crown the benefit here and assume that the fair market value for the new or nearly new merchandise is only 90% of the retail prices, Crown purchased the forfeited assets at **steeply** discounted prices. In total, Crown Pawn paid approximately $82,000 for the forfeited assets, which is less than 25 percent of their aggregate retail value of approximately $344,000. [*See* ECF Nos. 113, p. 12; 331-1; 331-4]. This is nowhere near the 45-to-60-percent formula that Crown says it used (and even more remote from the higher percentage formula that Crown says it sometimes uses for watches).

Even if the Court were to reduce the total value by an additional 10%, the total fair market value would be approximately $310,000, which means that Crown would have paid about 26.5% of the total fair market value. And that comes nowhere near the

purported formula.

## 2.    *Ignoring Red Flags*

Crown is undoubtedly an experience pawnbroker. The company has been in business for more than 15 years, since 2002. [ECF No. 357, pp. 131, 136]. And over those years, Crown's business has grown to eight locations in Broward and Palm Beach Counties, as well as into an online presence. [ECF No. 357, pp. 19, 41, 131].

As an experienced pawnbroker, Crown knew or should have known that neither Lewis nor Hunt had the income to afford the forfeited assets. Crown purchased from Hunt and Lewis -- in 12 transactions over seven days in a one-month period -- a total of 32 luxury items worth hundreds of thousands of dollars. [ECF Nos. 113, p. 12; 331-1; 331-4]. For each of the three transactions it conducted with Lewis, Crown listed her occupation as "student." [ECF Nos. 331-1; 331-4]. Similarly, for each of the nine transactions it conducted with Hunt, Crown noted that she was "unemployed." [ECF Nos. 331-1; 331-4].

Notably, concerning Hunt, she testified that she never provided Crown with such information. [ECF No. 357, p. 192]. The Undersigned listened carefully to her testimony and observed her demeanor at the evidentiary hearing, and I specifically find her to be credible, overall. And, concerning the specific point about her occupation, I find that this testimony was also credible.

In addition, before purchasing the forfeited assets, Crown negotiated the prices

20

over the telephone with "Jimmy," a person who Crown employees never met. [ECF Nos. 331-1, p. 6; 357, pp. 27–28, 105–106, 185, 196–97, 213–14, 220]. "Jimmy," of course, was actually James Sabatino, who was incarcerated the entire time. [ECF Nos. 231, p. 4; 357, p. 193].

Even though they were confronted with these red flags, Crown deliberately avoided questioning Hunt or Lewis about how they had obtained the forfeited assets. Despite their obvious lack of income; their numerous visits within one month (the same duration as the statutory holding period); the number of high-value, brand-name items involved; and the extensive telephone negotiations with an unknown third party, Crown believed it was "none of our business" as to how Hunt or Lewis could afford the forfeited assets. [ECF Nos. 331-1, p. 2; 357, pp. 52, 57, 107, 155, 194].

Moreover, despite multiple conversations with "Jimmy," Crown employees failed to determine how "Jimmy" was related to Hunt or Lewis or why he was so involved in the sale of the forfeited assets. [ECF Nos. 331-1, p. 6; 357, pp. 35, 58–59, 87, 99–101, 105–06, 112, 185]; [see also ECF No. 357, p. 197 (Hunt testifying that she never told Crown that "Jimmy" was her husband or a family member and that the employees did not ask about her relationship with him)].

According to Crown, their employees were required to ask only if the property belonged to Hunt or Lewis, but even that question does not appear to have been consistently posed. [See ECF Nos. 331-1, p. 2; 357, pp. 52, 57, 107, 155, 194]. Hunt

credibly testified that she was asked just once if the merchandise belonged to her. [ECF No. 357, p. 183].

Hunt also credibly testified that she "a hundred percent" believed that Crown was "in on the transactions" because, in her words: "When I would go to Crown Pawn on numerous times, Your Honor, I wasn't asked for any paperwork. I wasn't asked for my employment. I wasn't asked about where the merchandise came from. They didn't ask me anything." [ECF No. 357, pp. 208–09].

Crown employees also avoided asking if the items were stolen. [ECF No. 357, p. 109–110]. Although Crown's owner testified that he telephoned a contact at the Hollywood Police Department to check one of the Audemars Piguet watches, Crown's owner admitted that this due diligence was conducted only *after* the watch had already been acquired by Crown. [ECF No. 357, p. 179]. Tellingly, Crown did not buy any additional items from the defendants. [*See* ECF Nos. 331-1; 331-4 (last transaction dated July 15, 2015)].

So although Crown views this telephone call as evidence of its due diligence, the call is, at best, a reed-thin piece of evidence. Crown did not make similar calls for any of the other items, and even the one call it did make was an after-the-fact inquiry. Moreover, one could argue that Crown making that call after it made the purchase suggests that it *did* have suspicions, which it belatedly decided to investigate.[8]

---

[8]     Crown has also referenced its cooperation with law enforcement agents in

Some other red flags should have also aroused Crown's suspicions. For instance, Crown employees testified that Hunt and Lewis arrived at the pawnshop by limousine and accompanied by at least one "bodyguard." [ECF No. 357, pp. 34–35, 97–98, 109]. Crown employees acknowledged that it was unusual for Crown customers to arrive in limousines, but they failed to question how Hunt or Lewis could still afford limousine transportation if they also needed to sell assets at discounted prices. [ECF No. 357, pp. 97–98, 109–110].

Also, Crown's owner testified that he personally checked the packaging material and receipts for Jimmy Choo merchandise that Lewis brought into the store. [ECF No. 357, pp. 154–155]. Other employees testified that the Audemars Piguet watches and other items brought by Hunt and Lewis came in brand-name packaging with shipping labels as well. [ECF No. 357, pp. 34, 117]. That brand-name packaging, however, was noticeably different from the packaging that Crown employees normally encountered. [ECF No. 357, pp. 87–88, 98–99, 117]. "It was not in original packaging. It was separate." [ECF No. 357, p. 155]. It was instead "manufacturing packaging." [ECF No. 240].

Despite this discrepancy, no one at Crown bothered to ask Hunt or Lewis why

support of its petition. Although Crown's owner and employees turned over the forfeited assets to the agents and spoke with them, they initially refused to disclose the name of the Hollywood Police Department police officer who checked the Audemars Piguet watch. In addition, Crown employees did not, at the time, mention that "Jimmy" was involved in the transactions by negotiating prices over the telephone and did not provide the phone number that "Jimmy" used to contact the pawnshop and its employees. [ECF No. 357, p. 234].

the forfeited assets, obtained directly from the designer companies, lacked the individual boxes and original packaging normally associated with lawfully purchased items.

Moreover, Crown employees not only failed to question Hunt or Lewis on the source of their goods, but they also ignored behavior that should have stopped them from acquiring the forfeited assets. In general, Crown does not train its employees on how to determine whether a conveying customer is under the influence of alcohol or a controlled substance. [ECF Nos. 331-1, p. 10; 357, p. 60]. During an interview with law enforcement agents, Crown's owner even suggested that they make no efforts to ascertain whether customers are under the influence -- the owner said "that drug users may come to the pawn store but that he doesn't know them and that he can't make a judgment about them." [ECF No. 357, p. 235].

Consequently, it is not surprising that on at least one occasion, Crown purchased goods from Lewis while she was under the influence of a controlled substance. [ECF No. 357, pp. 185–186, 214–215]. After smoking "flakka," Lewis behaved erratically at Crown's store. [ECF No. 357, pp. 184–186]. She "was talking a hundred miles a minute to James [Sabatino]" and "wasn't acting normal." [ECF No. 357, pp. 185–186]. When Lewis, while under the influence of a controlled substance, entered Crown with "thousands of dollars worth of [goods], and proceeded to sell such items for pennies on the dollar, any reasonable observer could conclude, as a matter of common sense, that

24

the goods were stolen." *United States v. Baralato*, 535 F. App'x 263, 271 (4th Cir. 2013).

Crown completed the transaction anyway. [ECF No. 357, p. 184].

> **3.** *Violating State and Federal Law and the AML Compliance Program*

Crown also violated the Florida Pawnbroking Act, federal reporting requirements, and its own AML compliance program in acquiring the forfeited assets. Under the Florida Pawnbroking Act, a pawnbroker must complete a "pawnbroker transaction form" that identifies details of the seller, the goods involved, and the amount paid at the time it enters into any purchase transaction. § 539.001(8).

Importantly, pawnbrokers are prohibited from "[k]nowingly enter[ing] into a pawn or purchase transaction with any person who is under the influence of alcohol or controlled substances when such condition is apparent, or with any person using the name of another or the registered name of another's business." § 539.001(12)(f). A pawnbroker also may not "[k]nowingly accept or receive misappropriated property from a conveying customer in a pawn or purchase transaction." § 539.001(12)(n).

Crown's AML compliance program, available on the company's website, contains similar prohibitions on transacting with third parties. [ECF No. 331-5]. Based on the transactions presently at issue and the testimony of its owner, Crown is federally required to maintain an AML compliance program.[9] *See* 31 C.F.R. § 1027.100, *et seq.*;

---

[9]   Online industry materials confirm that federal regulations require pawnbrokers to maintain an AML compliance program if they **purchase** covered goods rather than

25

[ECF No. 357, pp. 144–147]. The policy "is based on Crown Pawn Shop's assessment of the money laundering and terrorist financing risks associated with Crown Pawn Shop's transactions pertaining to covered goods." [ECF No. 331-5, p. 1]. Under its AML compliance program, Crown must obtain "identification information for *any third party associated in any manner* with any transaction for covered goods." [ECF No. 331-5, p. 1 (emphasis added)]. Purchases and payments must be "made only directly to the person offering the goods for sale, *not to a third party,* unless such third party has been fully identified and the reason for the participation of the third party adequately explained." [ECF No. 331-5, p. 3 (emphasis added)]. In addition, Crown's policy also mandates that purchases be made "only in the form of company check." *Id.*

---

obtain goods through a pawn. *See* Important Information for Pawnbrokers Who Also Buy Gold and Other Precious Metals, Gems and Jewelry Directly from the Public, National Pawnbrokers Association, NATIONAL PAWNBROKERS ASSOCIATION, https://www .nationalpawnbrokers.org/2012/important-information-for-pawnbrokers-who-also-buy-gold-and-other-precious-metals-gems-and-jewelry-directly-from-the-public/.

According to the informational sheet:

As the NPA [National Pawnbrokers Association] explained at the time that the 2005 version of the Rule was promulgated, it provides a limited exemption for pawnbrokers. This exemption allows items taken in pawn otherwise covered by the rule, as well as their subsequent foreclosure and sale to be handled without the necessity of complying with the Rule. However, items **purchased directly from the public or sales** *other than of items of collateral subsequently foreclosed on and sold* remain subject to this Rule's requirements.

*Id.* (bold emphasis added).

The acquisition of the forfeited assets was significant or "big" for Crown, as all but one of the transactions involved more than $1,000 and the company's purchases generally involve less than that sum. [ECF No. 357, p. 65]. At times, to secure enough cash to complete the deals, employees had to go to other Crown locations to retrieve sufficient cash. [ECF No. 357, pp. 36, 40, 50, 134, 199].

Disregarding Florida law and its own compliance program, Crown purchased the forfeited assets from an unknown third party, "Jimmy," in cash. "Jimmy" (i.e., James Sabatino) directly arranged to sell the forfeited assets with Crown employees and negotiated the prices for the items. Crown employees did not know his last name, employment, address, or any other identifying information required by the pawnbroker transaction forms. By failing to determine Sabatino's relationship with Hunt or Lewis, or to any of the forfeited goods, Crown improperly transacted with an unknown third party. *See* § 539.001(12)(f); [*see also* ECF No. 331-5].

In further violation of its AML compliance program, if not federal law, Crown appears to have structured transactions involving the forfeited assets. Under both its compliance program and federal law, Crown Pawn must file an IRS Form 8300 when it receives more than $10,000 in cash in a single transaction or related transactions. [*See* ECF No. 331-5, p. 1]; *see also* 26 U.S.C. § 6050I.

Crown has claimed that transactions at issue were broken up at the **defendants' request** to facilitate later redemption, but that explanation is not supported by the

actual evidence developed in this case. [ECF No. 357, pp. 167–177]. As an initial point, Crown structured the transactions to be less than $10,000 -- and not by individual item. *Id.* Moreover, it does not seem plausible that the defendants, who were motivated to sell the fraudulently obtained merchandise quickly, would seek to redeem or buy back any items. Indeed, Hunt testified that she never asked Crown employees to break up transactions and she did not seek to return the items. [ECF No. 357, p. 196].

The only plausible explanation for Crown's behavior is that it likely structured these transactions because it wanted to avoid reporting the transactions **if** the forfeited assets were later redeemed or bought back. Crown is not required to report cash *purchases*, but it **is** required to file an IRS Form 8300 if it receives more than $10,000 in cash in a redemption or some other transaction. *See* IRS CCA 201536022 (Sept. 4, 2015) (requiring reporting of transaction that permits conveying customer to buy back item); [*see also* ECF No. 357, p. 82].

Crown's knowing and repeated violations of its AML compliance program hardly served to deter the unlawful business it claimed it wanted to avoid. [ECF No. 357, p. 73]. While a pawnbroker may transact in cash or break up transactions to ease redemption, it was not objectively reasonable for Crown to purchase the forfeited assets in violation of not only an AML compliance program designed to protect it against dealing in misappropriated goods, but also state and federal law.

Despite its success and experience, Crown "overlooked significant aspects of" the purchase of the forfeited assets, "which, upon proper inquiry, would have alerted [it] to serious questions concerning the legitimacy of the transaction[s]." *See Medina Cuartes*, 155 F. Supp. 2d at 1343. In doing so, it also assumed the risk that the goods it purchased had been misappropriated by the defendants.

In light of these facts and circumstances, the Undersigned concludes that Crown was not a bona fide purchaser and is not entitled to recover the forfeited assets.

## V.    Conclusion

The Undersigned **respectfully recommends** that Judge Lenard **deny** Crown's petition because it failed to meet its burden under both of the statutory grounds on which it relied.

## VI.    Objections

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.

*See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on April 13, 2018.

                                      Jonathan Goodman
                                      UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All Counsel of Record